UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

RNC CONSOLIDATED CASES,

                           Plaintiffs,

              -against-

THE CITY OF NEW YORK, ET. AL.,

                        Defendants.

------------------------------------------------------------------------- x

**DECLARATION OF
RAJU SUNDARAN**

(RJS)(JCF)

RAJU SUNDARAN, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

1.     I am an Assistant Corporation Counsel in the office of MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, attorney for defendants.

2.     I am familiar with the facts and circumstances stated herein based upon personal knowledge, the books and records of the City of New York,  and conversations with its agents and employees.  I submit this declaration in support of defendants' memorandum of law in opposition to plaintiffs' motions for leave to amend their complaints, and to place the pertinent records before this Court.

3.     Annexed hereto as <u>Exhibit A</u> are the relevant excerpts from the Declaration of Deputy Commissioner David Cohen, sworn to on June 6, 2007.[1]

---

[1] A complete copy of Cohen's Declaration can be provided upon the Court's request.

4.    Annexed hereto as <u>Exhibit B</u> are the relevant excerpts from the deposition testimony of Deputy Commissioner David Cohen, dated March 28, 2007.

5.    Annexed hereto as <u>Exhibit C</u> are the relevant excerpts from the deposition testimony of Chief Joseph Esposito, dated July 7th, July 11th, July 14th, and July 21, 2006.[2]

Dated: New York, New York
      October 23, 2007

 

 

RAJU SUNDARAN (RS 8011)
Assistant Corporation Counsel

---

[2] Complete copies of all cited testimonies can be provided upon the Court's request.

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MICHAEL SCHILLER, FRANCESCA :
FIORENTINI, ROBERT CURLEY, and :
NEAL CURLEY, :
 :
    Plaintiffs, :
   vs. :
 :  04 Civ. 7922 (KMK) (JCF)
 :
The CITY OF NEW YORK; RAYMOND :
KELLY, Commissioner of the New York City :
Police Department; TERENCE MONAHAN, :
Assistant Chief of the Bronx Bureau of the New :
York City Police Department, :
 :
    Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

HACER DINLER; ANN MAURER; :
ASHLEY WATERS; :
 :
    Plaintiffs, :
 :  04 Civ. 7921 (KMK) (JCF)
   vs. :
 :
The CITY OF NEW YORK; RAYMOND W. :
KELLY, Commissioner of the New York City :
Police Department, :
 :
    Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF DEPUTY COMMISSIONER DAVID COHEN

  **DAVID COHEN** declares, under penalty of perjury pursuant to 28 U.S.C. §1746, that

the following statements are true and correct:

  1.  I am the Deputy Commissioner for Intelligence for the New York City Police

Department ("NYPD"), a position I have held since February of 2002. In that capacity, I have

officer. Taken together with other documents a person may learn the scope of program activities, and number of undercover officers involved.

- **Description of activities** - Like date, time and place information, the descriptive details reported on will allow the person about whom the report is concerned or who may have been present during the activities reported on, to realize that someone present was an undercover police officer. With data from other sources and documents, a person may determine the identity of the undercover and the scope of all undercover work across the entire investigative program. Activities will also reflect the methods used by the undercovers and aspect of their tradecraft.

19.    In sum, the presence of a high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources, methods and capabilities can be determined.

**F.    Reasons Documents Should Not Be Released**

20.    I emphasize that the release of the raw unevaluated field reports and other documents because they provide direct or indirect information on sources and methods would severely compromise the intelligence capabilities of the NYPD. Such a compromise would greatly undermine our ability to address the threats to New York City noted in the Appendix as well as those threats yet to surface. Indeed, based on my forty-one years experience as a career intelligence officer it is my strongest professional view that the damage to the NYPD intelligence program, a program that has become an essential element in the public security and safety of New York City in this post 11 September 2001 era, from the release of such material would be severe and irreversible.

21.    Contrary to the impression raised by the press, there was never an isolated "RNC Squad" whose work was separate and discrete from the rest of the Intelligence Division's information gathering mission. Indeed, most of the personnel, including undercover personnel, and all of the methodologies were, and are involved in all aspects of the Intelligence Division's information gathering and processing responsibilities. Consequently, sources and methods

damage resulting from the release of documents that I believe should be redacted or withheld, would impact on the entire intelligence program, not just a so-called "RNC Squad."

22.     The raw, unevaluated field intelligence reports co-mingle the substance of our information gathering effort with data that are both source and methods revealing. The raw, unevaluated field intelligence reports contain extremely detailed information about a particular activity including the geographic location, the premises, the time of meetings, numbers of persons present often identifying them by name, relationships between undercovers and confidential informants and other contacts they might have, as well as methods of communication and the means by which information is gathered. Any attempt to remove the sensitive information which provides a basis for determining sources and methods would be futile, resulting in pages of meaningless snippets of text and punctuation.

23.     The presence of the high level of detail in the raw, unevaluated field intelligence reports makes it possible to connect strands of information which in turn, provides a factual basis from which the identity of sources could be deduced and the Intelligence Division's methods of operation revealed. Open source information makes it clear that there are individuals and groups that would welcome the opportunity to connect the strands of information in the raw, unevaluated field intelligence reports. To confirm that fact one need only go to the website titled "whosarat.com" which bills itself as the largest online database of informants and agents.

24.     Open source information from the reports produced in the case and referred to in the Appendix gives an indication of how individuals and groups intent on violence and disorder, including terrorist operatives, would welcome the information contained in the raw, unevaluated field intelligence reports. For example, "Marking Law Enforcement" was the name given to a tactic posted on the Internet, Appendix at 16, which advocated the identification of suspected law

that threatened to do so during the RNC. The disclosure of the raw, unevaluated, field intelligence reports would make it impossible to conduct effective investigations on such groups in the future.

### G.    Conclusion

30.    In conclusion, I wish to state that it is my belief that releasing the raw unevaluated field intelligence reports and the redacted materials in other documents would cause certain and irreversible damage to the NYPD intelligence program, and, in turn, the NYPD's ability to defend New York City from another terrorist attack and other threats to the security and safety of the public.

Dated: New York, New York
        June 6, 2007

_____
David Cohen
Deputy Commissioner for Intelligence

- 13 -

Exhibit B

1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------------x

4   MICHAEL SCHILLER, et al.,

                        Plaintiffs,

5            -against-

6   THE CITY OF NEW YORK, et al.,

                        Defendants.

7   ---------------------------------------x

8   HACER DINLER, et al.,

                        Plaintiffs,

9            -against-

10  THE CITY OF NEW YORK, et al.,

                        Defendants.

11  ---------------------------------------x

12                     March 28, 2007
                       10:10 a.m.

13

14          **CONFIDENTIAL**

15

16

17          DEPOSITION of DAVID COHEN, taken by

18  the Plaintiffs, at the law offices of NYCLU, 125

19  Broad Street, New York, New York before Karen

20  Perlman, a Shorthand Reporter and Notary Public

21  within and for the State of New York.

22

23

            GREENHOUSE REPORTING, INC.

24      363 Seventh Avenue - 20th Floor
            New York, New York    10001

25             (212) 279-5108

27

1              D. Cohen - Confidential

2                   (The following portion of the record

3         is read:

4                   "QUESTION:  What are your general

5         responsibilities in that position?")

6         A.      In the broader sense, my

7    responsibility is to advise the Police

8    Commissioner on threats to the public security

9    and safety of the City from outside the City and

10   inside the City, the -- what is the nature of

11   that threat, what form it takes, and how it might

12   materialize and see its way through.  And in many

13   respects that's -- that's the most important

14   function I serve.

15                  The -- the corresponding

16   responsibility is to oversee the -- and provide

17   the leadership and -- and oversee the management

18   of the NYPD Intelligence Division.

19                  Collateral to those responsibilities

20   is to sustain -- to develop and sustain liaison

21   relationships on behalf of the Department with

22   other law enforcement and intelligence agencies,

23   locally, regionally, nationally, and

24   internationally.

25        Q.      You mentioned that amongst your

42

```
 1                 D. Cohen - Confidential
 2    Convention in approximately January 2003, were
 3    you assigned any responsibilities with respect to
 4    the NYPD's activities around the convention?
 5          A.    What do you mean by assigned
 6    activities?
 7          Q.    What I mean is, let's set aside the
 8    word assigned, did you assume any
 9    responsibilities with respect to the NYPD's
10    involvement in the convention?
11          A.    Yes.
12          Q.    What generally were those
13    responsibilities?
14          A.    Well, as -- as I indicated before,
15    my responsibility is to advise the Commissioner
16    on -- on threats to the City from either from
17    within or without, what -- what the nature of
18    those threats might be, and what form they may
19    take, and with that general responsibility, once
20    the determination was made that -- that the RNC
21    would be located in New York, and I believe that
22    occurred in February, not January, I assumed
23    responsibility for advising them, the -- the
24    Commissioner and the Chief of the Department, I
25    might add, on those aspects of the -- the RNC.
```

45

D. Cohen - Confidential

1

2  time, and you have many things in your life

3  happening.

4        A.    Right, right.

5        Q.    There was a period of time where all

6  of a sudden the convention was coming and you

7  talked.

8        A.    Exactly.  At some point I would have

9  said to the Commissioner, you know, the

10  Intelligence Division will be responsible for

11  articulating for him and the Department

12  leadership anything we -- we determine would pose

13  a threat to the safe undertaking of the -- the

14  RNC event.

15        Q.    What do you recall, if anything, and

16  I realize again, there are a lot of things

17  happening here, what do you recall about the

18  particulars of your early conversations about

19  what it was that the Intelligence Division

20  specifically would be doing?

21        A.    Well, in -- in those early months

22  after the announcement was made that the RNC

23  would come to New York, there was a very public

24  reaction with respect to the, you know,

25  reconstructing the times, there is a lot of

48

1                    D. Cohen - Confidential

2     executive group, but let me just make sure we're

3     talking about the same thing.

4                    He, as I recall, testified that he

5     was a regular member of that, that First Deputy

6     Commissioner Grosso was a member of that.  I

7     believe he testified that you had participated in

8     those meetings, I don't want to say all the time

9     but often, and I must say I don't remember him

10    saying anything about Mr. Sheahan, was the Deputy

11    Commissioner for counterterrorism part of that

12    group?

13         A.    Chris, I honestly don't remember the

14    permanent membership.  It may have changed,

15    depending on the issue of the week, or the

16    bi-weekly -- I know two people were always there,

17    and that was Commissioner -- and that is when I

18    was there, Commissioner Kelly, and the Chief of

19    Department.

20         Q.    That is the same thing that he said.

21    He said that two people were always at those

22    meetings were the two of them.

23         A.    There you go.

24         Q.    There we go.

25                    So this group got set up, we have a

53

1            D. Cohen - Confidential

2            MR. FARRELL:  Objection.

3      A.    -- characterization of it.  It

4  wasn't political surveillance.

5      Q.    Okay.

6      A.    This was information gathering to

7  assure the security of the City and the estimated

8  800,000 people who came to participate in protest

9  activities.

10     Q.    Well, I don't want to use a term

11 that you will consider misleading.

12     A.    There was no political surveillance,

13 this was a program designed to determine in

14 advance the likelihood of unlawful activity or

15 acts of violence.

16     Q.    And as I understand your testimony,

17 within the Intelligence Division there was no

18 name given to this program?

19     A.    There was no name given to this

20 program.

21     Q.    Are you familiar with the term

22 special opp?

23     A.    Yes.

24     Q.    Was that a term that was used to

25 describe this program?

56

```
 1              D. Cohen - Confidential
 2         the use of the word "program" or its
 3         continued use.
 4         Q.    Who made the decision to undertake
 5    this program?
 6              MR. FARRELL:  Objection.
 7         A.    I made the decision to initiate an
 8    effort of information gathering with an eye
 9    towards identifying the possibility of unlawful
10    activity and/or violence in New York City during
11    the period immediately before and during the
12    Republican National Convention.
13         Q.    Did there come a point in time in
14    which you informed Commissioner Kelly that you
15    had made that decision?
16         A.    It was marbled into life at the
17    time.
18         Q.    That is an expression I remember you
19    using before.
20         A.    Hmm?
21         Q.    I said that is an expression that I
22    remember you using before in a different context,
23    but what I'm asking you is, understanding that,
24    does that mean that yes, there was a point in
25    time in which you informed or Commissioner Kelly
```

109

1              D. Cohen - Confidential

2              The investigations that took place

3    following these leads in fact produced

4    information for the Intelligence Division, is

5    that fair to say?

6         A.    Yes.

7         Q.    And where I started with this was

8    about the periodic briefings that you provided to

9    the RNC executive group.

10             And the question I asked you was did

11   those briefings include information about the

12   investigations that were conducted by the

13   Intelligence Division following the leads that

14   you said were produced through the on-line

15   investigation, or the on-line review process?

16             MR. FARRELL:   Objection.

17        A.    The -- the information -- the

18   overwhelming proportion of the intelligence, I

19   would have used in the briefings of the executive

20   committee would have emanated from the things we

21   were learning from the on-line research effort,

22   not exclusively, but predominantly.

23        Q.    So I take it then that it would be

24   fair to say that setting aside the exact

25   proportions, that information that was gathered

110

1                    D. Cohen - Confidential

2    through the investigations that took place was

3    part of the information that was conveyed through

4    these briefings to the RNC executive group?

5                    MR. FARRELL:  Objection.

6         A.    Because I sat through the pre-break

7    discussion, I'm educated by it, or informed by

8    it.

9                    The -- the -- again, I want to

10   emphasize the predominant share of the

11   information that I used to brief the executive

12   committee and Commissioner Kelly would have come

13   from what is in this pile.

14        Q.    I understand you're using the term

15   "predominant", but you also made it quite clear

16   it was not the exclusive source of that

17   information?

18        A.    Correct.

19                    MR. DUNN:  So, Peter, I think we

20            should call Judge Francis, and I think we

21            should schedule a time to talk to him, if

22            he can see us now, talk to us in a half an

23            hour, we can do that.

24                    MR. FARRELL:  Are you proposing

25            here, you're saying you want to call him

192

1              D. Cohen - Confidential
2    know what was happening, guidance, whatever, was
3    in writing?
4              MR. FARRELL:  Objection.
5         A.    My guess is it was not in writing.
6         Q.    Do you recall ever seeing any
7    written guidance or instructions to Captain
8    DiMartino or to the people working under his
9    supervision about the identification of relevant
10   RNC information that would be then forwarded to
11   the Chiefs for consideration?
12        A.    Say that again, because my mind went
13   someplace else, I'm sorry.
14             MR. DUNN:  Read that back.
15             (The record is read.)
16        A.    I think, and again, this is how I
17   believe it worked, streams of reporting or
18   knowledge coming from this effort could have
19   taken different forms.  We just uncovered that
20   there is a plan or people are starting to talk
21   about doing this bad thing.  If there were a
22   website, a chat room that said no, we shouldn't
23   do those things, both pieces of information would
24   have moved up.
25        Q.    Okay, I understand that.  What I'm

Exhibit C

1

1

2 UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3 -------------------------------------x

4 MICHAEL SCHILLER, et al.,

                        Plaintiffs,

5      -against-

6 THE CITY OF NEW YORK, et al.,

                        Defendants.

7 -------------------------------------x

8 HACER DINLER, et al.,

                        Plaintiffs,

9      -against-

10 THE CITY OF NEW YORK, et al.,

                        Defendants.

11 -------------------------------------x

12                     July 7, 2006
                     10:00 a.m.

13

14

15    Deposition of JOSEPH ESPOSITO, held at

16 the offices of NEW YORK CIVIL LIBERTIES

17 UNION, 125 Broad Street, New York, New York,

18 before Vicky Galitsis, a Certified Shorthand

19 Reporter and Notary Public of the State of

20 New York.

21

22

23

           GREENHOUSE REPORTING, INC.

24      363 Seventh Avenue - 20th Floor
        New York, New York   10001

25          (212) 279-5108

82

E. Esposito

1    there have been conversations with

2    Commissioner Kelly about the department's

3    practice of not issuing C summonses at certain

4    designated events?

5                    MR. FARRELL:  Objection.

6        A.      Not that I recall.

7        Q.      Do you know of any situations in

8    which Commissioner Kelly was the one who made

9    the decision to institute this policy for a

10   particular event, setting aside the

11   convention?

12                   MR. FARRELL:  Objection.

13       A.      Not that I recall.

14       Q.      Do you know of any instance in

15   which you are the one who made the decision to

16   institute this policy for a particular event

17   other than the convention?

18                   MR. FARRELL:  Objection.  You

19           keep calling it a policy.  He used the

20           word strategy as an option.

21                   My continuing objection is to the

22           form of the question and your use of

23           the word policy.

24       A.      Not that I recall.

Greenhouse Reporting, Inc.                          (212)279-5108

150

```
1                    E. Esposito
2   other executives.  But again at some of those
3   meetings there were presentations made by the
4   committees.  So those presentations were
5   preserved, I would assume.
6        Q.     Beyond Commissioner Kelly and
7   perhaps First Deputy Commissioner Grosso and
8   yourself, is there anyone else who was a
9   regular participant in those meetings?
10                MR. FARRELL:  Objection.
11       A.     I can't say for sure.  I'm not
12  even sure, as I said, about Grosso.
13       Q.     I understand that.  That's why I
14  said perhaps Commissioner Grosso.
15                You also mentioned tabletop
16  exercises.  What were you referring to?
17       A.     I believe we had one at -- if my
18  memory serves me -- we had an exercise at the
19  Garden, and it was a multi-agency exercise
20  tabletop exercise, and I believe that had to
21  do with the RNC.  I could be mistaken.
22                I remember going to one at the
23  Garden.  A lot of federal agencies were there,
24  state agencies, a lot of different agencies
25  were there.  And I believe that was in regards
```

249

E. Esposito

1

2    A.    I had to go through the whole

3    thing.  I'm sure we approved the vast majority

4    of it.  I don't know if it was all approved.

5    Q.    I'm happy to go through it now or

6    you can go through it over the weekend and we

7    can talk about it on Monday.

8    A.    Sure, I'll go through it now.

9    I think this was approved.  I

10   don't recall any changes.

11   Q.    Was Commissioner Kelly present

12   for this executive staff meeting?

13   A.    Yes.

14   Q.    Did he participate in the

15   approval of this plan?

16   A.    Yes.

17   Q.    Do you know why there was a

18   special procedure set up for the August 29th

19   UPJ event?

20   A.    Just because of the size of it,

21   you know.  It was going to be a massive amount

22   of people participating.  So we wanted to be

23   ready for it.

24   Q.    As I understand this document,

25   and I'm looking at the page that Bates stamped

257

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  ------------------------------------------x

4  MICHAEL SCHILLER, FRANCESCA
   FIORENTINI, ROBERT CURLEY and

5  NEAL CURLEY,

6                           Plaintiffs,

7          - against -            04 Civ. 07922

8  THE CITY OF NEW YORK; RAYMOND
   KELLY, Commissioner of the New York City

9  Police Department; TERENCE MONAHAN,
   Assistant Chief of the Bronx Bureau of the

10 New York City Police Department,

11                          Defendants.

12 ------------------------------------------x

13                      July 11, 2006
                       10:05 a.m.

14

15      Deposition (Continued) of CHIEF JOSEPH

16 ESPOSITO, taken by the Plaintiffs, pursuant to

17 Order and Adjournment, at the offices of New

18 York Civil Liberties Union, 125 Broad Street,

19 New York, New York, before Loretta M. Bodtmann,

20 a Shorthand Reporter and Notary Public within

21 and for the State of New York.

22

23

             GREENHOUSE REPORTING, INC.
24        363 Seventh Avenue - 20th Floor
             New York, New York 10001

25                (212) 279-5108

266

1              J. Esposito

2              Chief Esposito, to the extent you

3    can recall -- if you don't recall you should

4    tell me -- to the extent you can recall, what

5    specific information was provided to you and

6    Commissioner Kelly at the Executive Staff

7    meeting that was taken into account at that

8    meeting in making the decision to adopt the

9    no-summonses policy for the Convention?

10             MR. FARRELL:   Objection.

11        A.    I want to make it clear.   There is

12   an Executive Staff briefing for the RNC.   They

13   are two different meetings.   You are talking

14   about a meeting when we were discussing the

15   RNC.

16        Q.    Yes, I'm sorry.   As you recall you

17   described the special RNC meeting as being in

18   the form of an Executive Staff meeting?

19        A.    Yes.

20        Q.    I'm referring to those particular

21   meetings?

22        A.    Okay.

23        Q.    As I understand it, there was a

24   meeting where, setting aside the specific date

25   of that meeting, a decision was made to put in

267

J. Esposito

1

2     place a no-summonses policy during the

3     Convention, is that correct?

4         A.    Yes.

5         Q.    I'm going to focus on that meeting.

6         A.    Yes.

7         Q.    At that meeting, what recollection,

8     if any, do you have about the specific factual

9     information that was provided to you and

10    Commissioner Kelly on the issue of whether or

11    not the Department should adopt a no-summonses

12    policy for the Convention?

13            MR. FARRELL:   Objection.

14        A.    A decision was made after

15    recommendations by the committee that dealt with

16    the whole arrest processing area of the

17    Convention.  The sort of things that we took

18    into consideration would have been --

19        Q.    Okay, when you say would have been,

20    let me stop you.  I want to make sure you're

21    testifying to what you recall as opposed to what

22    would have been.

23        A.    Right.

24        Q.    As you sit here now, do you recall

25    the conversation?

271

1                       J. Esposito

2   Commissioner Kelly received that formed the

3   basis for the Convention's no-summonses policy?

4              MR. FARRELL:  Objection.

5        A.    Not that I recall right now.

6        Q.    Was the decision to adopt a

7   no-summonses policy for the Convention a

8   decision that would have been jointly made by

9   you and Commissioner Kelly?

10       A.    Ultimately it is his decision.

11       Q.    Do you recall him saying any words

12  at the meeting where the decision was made in

13  which he expressed his views or his decision

14  that that would be the policy?

15             MR. FARRELL:  Objection.

16       A.    I don't recall.

17       Q.    In your testimony on Friday you

18  mentioned that since the Convention there are

19  now some circumstances in which DATs could be

20  issued without a person being fingerprinted.

21             Do you recall that testimony?

22       A.    Yes.

23       Q.    What are the circumstances under

24  which that can now take place?

25             MR. FARRELL:  Objection.

515

1
2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------x
4   MICHAEL SCHILLER, et al.,
                        Plaintiffs,
5            -against-
6   THE CITY OF NEW YORK, et. al.,
                        Defendants.
7   -------------------------------------x
8   HACER DINLER, et al.,
                        Plaintiffs,
9            -against-
10  THE CITY OF NEW YORK, et. al.,
                        Defendants.
11  -------------------------------------x
12                   July 14 2006
                     10:02 a.m.
13
14
15              Continued Deposition of
16  Defendant, by JOSEPH ESPOSITO, taken by
17  Plaintiffs, pursuant to Adjournment, at the
18  offices of New York Civil Liberties Union, 125
19  Broad Street, New York, New York 10004, before
20  Angela Castoro a Shorthand Reporter and Notary
21  Public within and for the State of New York.
22
23
              GREENHOUSE REPORTING, INC.
24       363 Seventh Avenue - 20th Floor
            New York, New York  10001
25              (212) 279-5108

558

J. Esposito

1

2      used "your."  He's not being specific

3      as to who.  So my "your" is as

4      unspecific as his "we."

5              MR. FARRELL:  To the extent that

6      that question calls for anybody's

7      comments other than the final

8      decision-maker on the mass arrest

9      processing plan, I am going to instruct

10     the witness not to answer that.  I am

11     going to assert the deliberate process.

12         Q.   Did Commissioner Kelly express

13  any qualms with regard to any aspects of the

14  final ultimate mass arrest plan?

15         A.   No qualms.

16         Q.   Okay.  Is what you're saying

17  about the way decision-making works in the

18  executive staff, that other members of the

19  executive staff may give advisor guidance to

20  the police commissioner, but that any ultimate

21  decision is ultimately his and there is only

22  one ultimate decision-maker within the New

23  York City Police Department and that's

24  Commissioner Kelly?

25              MR. FARRELL:  Objection.

559

```
 1                       J. Esposito
 2          A.     No, there is not -- there is not
 3   only one decision-maker.
 4          Q.     Okay.  Was there anybody else on
 5   the executive staff who acted as an ultimate
 6   decision-maker with regard to the mass arrest
 7   processing plan for the Republican National
 8   Convention?
 9                  MR. FARRELL:  Objection.
10          A.     No.
11          Q.     Was there anybody else on the
12   executive staff who acted as a final
13   decision-maker for any other aspects of the
14   RNC plan as were put forth in terms of
15   operations on the street or the purview of any
16   of the other RNC committee or was Commissioner
17   Kelly still the ultimate and only
18   decision-maker?
19                  MR. FARRELL:  Objection.  And I
20             specifically object to the breadth and
21             overbreadth of that question.
22          A.     When we plan, the RNC committees
23   are formed.  Decisions are made.  These
24   decisions or -- I guess they are
25   recommendations, the whole plan is brought to
```

560

1     J. Esposito

2 the police commissioner, is presented to him

3 by myself, other members of the executive

4 staff.  His seal of approval goes on the plan.

5 Much of that plan takes in decisions made by

6 other people.  So that decision is made by

7 someone else.

8     But ultimately I guess by

9 definition it's a recommendation until it's

10 approved by the police commissioner.  Yes, I

11 guess it's a recommendation.

12    Q.  I mean, in some other

13 circumstances within the police department

14 when we're not dealing with large events,

15 special events like the RNC, the police

16 commissioner delegates ultimate

17 decision-making power to yourself or other

18 high members?

19    A.  Yes.

20    Q.  Doesn't personally review them,

21 correct?

22    A.  Yes.

23    Q.  But during the RNC, my question

24 is whether or not the police commissioner had

25 to personally review and ultimately sign off

678

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  ---------------------------------x

4  DEIDRE MACNAMARA, ET AL.,

5                    Plaintiffs,      Case No.

6          -against-            04 CV 9216 (KMK)

7  THE CITY OF NEW YORK, ET AL.,

8                    Defendants.

9  ---------------------------------x

10                  July 21, 2006
                    10:35 a.m.

11

12

13

14        CONTINUED DEPOSITION of JOSEPH ESPOSITO,

15  taken pursuant to Notice, at the Offices of

16  Corporation Counsel, 100 Church Street, New York,

17  New York, before Marion Frola, a Shorthand

18  Reporter and Notary Public of the State of New

19  York.

20

21

22

23

              GREENHOUSE REPORTING, INC.

24       363 Seventh Avenue - 20th Floor
             New York, New York  10001

25              (212) 279-5108

689

1                          J. Esposito

2              MR. FARRELL:  Objection.  I instruct

3         the witness not to answer that on the basis

4         of deliberative process, and also note for

5         the record that this entire area of inquiry

6         has been gone over in the prior three days.

7         Q.    In any event, you were comfortable

8    with the decision and it was a decision that was

9    ultimately, as far as you know, signed off on by

10   Commissioner Kelly, correct?

11             MR. FARRELL:  Objection.

12        A.    Yes.

13        Q.    Was it a decision in which --

14   without telling me what his position was -- was

15   Chief of Patrol Estavillo involved in the

16   decision as to whether to adopt a no summons rule

17   or not?

18        A.    I don't know if he was at that

19   meeting.

20        Q.    How about the first deputy

21   commissioner, was it George Grasso at the time?

22        A.    It was George Grasso, and I believe

23   he was at the meeting, and I think Estavillo was

24   at the meeting also, I'm just not positive.

25        Q.    But it's your memory that the origin

Greenhouse Reporting, Inc.                    (212)279-5108